UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

Randy Lee Sykes,

    Plaintiff,

v.                                    CIVIL ACTION NO. 2:16cv593

Nancy A. Berryhill,
Acting Commissioner of Social Security,

    DEFENDANT.


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Randy Lee Sykes ("Sykes") seeks judicial review of the Acting Commissioner of the Social Security Administration's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. Sykes claims that the Administrative Law Judge ("ALJ") improperly analyzed medical evidence and erred in finding he was not disabled, and improperly assessed testimony given at the administrative hearing on April 19, 2016. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the undersigned recommends that the final decisions of the Commissioner be affirmed.

1

## I.  PROCEDURAL BACKGROUND

Sykes filed an application for DIB on October 15, 2015, alleging disability onset date of August 1, 2015. (R. 15). The Commissioner denied his application initially, (R. 88-92), and upon reconsideration, (R. 100-02). Sykes requested an administrative hearing, which occurred on April 19, 2016 (R. 15).

An ALJ determined that Sykes was not disabled within the meaning of the Social Security Act, and denied his claim for benefits. Id. The Appeals Council declined to review the ALJ's decision, (R. 1-3), making the ALJ's decision the final decision of the Commissioner. Id. Sykes filed this action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). This case is now before the court in order to resolve the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND[1]

Sykes was born in 1965, and was 49 years old at the alleged onset date of August 1, 2015. (R. 15, 77). He holds a bachelor's degree in security management, which he received online from American Military University. (R. 36). Sykes served

---

[1] For the reasons explained in this Report, the court looks only to the record in detailing the factual background of this case, not to the new evidence that Sykes submitted with his complaint.

in the United States Army from 1987 until 2013.[2] (R. 74). He reports his most recent employment was as a Barracks Manager. (R. 191). Sykes previously worked as a police officer and as a military analyst. (R. 66). He left the military on disability retirement in 2013 and has not worked since at least August 1, 2015. (R. 35, 68). The Department of Veterans Affairs rated Sykes as 100% disabled (R. 24, 148-58).

## A. Relevant Medical and Treatment History

Sykes complains of many medical conditions, but the record reflects major complaints of pain in his knees and lower back which he claims prevents him from working, sitting, or standing for any significant period. (ECF No. 15 at 6, 12); (R. 20-22, 34-35, 41-54).

### 1. Back and Spinal Treatment

In January 2014, x-rays of Sykes' lumbar spine revealed no apparent cause of his back pain. (R. 718). And although x-rays of Sykes' cervical spine in October 2014 still showed no acute abnormality, an MRI of his cervical spine in December 2014 revealed multilevel disc disease. (R. 714). Sykes' disc disease was without significant degeneration, but showed mild abnormalities. Id. In January 2016, x-rays of Sykes' spine

---

[2] In his Motion for Summary Judgment, Sykes listed his specific years of military service as 1987 to 1997 and 2002 to 2013. (ECF No. 16). His self-completed Work History Report implied the same. See (R. 190).

exposed nothing of concern. (R. 815). Similarly, in February 2016, an MRI of Sykes' spine indicated nothing concerning. (R. 853).

Although the MRIs of Sykes' spine from 2014-2016 reveal no serious abnormalities, the record reflects treatment for back pain. In October 2011, Sykes was referred to treatment for back and leg pain at RPK Center for Rehab, Spine and Pain Management ("RPK"). (R. 241-72). More specifically, RPK medical notes indicate that from 2011 to 2013, Sykes was routinely treated for "back pain associated with degenerative disc disease." See id. He received several injections in order to treat disc disease, which the RPK notes imply caused pain and some restricted motion. See id.

The RPK notes also mention x-rays of Sykes' spine in 2012 which showed mild degenerative changes. Id. Although sometimes limited due to pain, throughout his treatment at RPK, Sykes' gait and lumbar range of motion were normal. See id. He consistently ambulated to appointments without assistance. Id. Additional records from Hampton VA Medical Center similarly note mild degeneration in Sykes' spine. See, e.g., (R. 334-35, 353).

2. Knee Treatment

In January 2014, bilateral radiographs of Sykes' knees revealed no fracture or dislocation. (R. 717). However, the

4

radiographs did indicate some degenerative changes, such as osteoarthritis. (R. 717). In November 2015, Sykes reported that his left knee cap had dislocated twice and that his right knee was "popping," causing pain. (R. 657). Sykes' physician offered to refer him to physical therapy, but informed him that an x-ray of his knees was required before referral. (R. 641, 787). Knee x-rays from December 2015 subsequently revealed no fracture or dislocation, but did indicate bilateral degenerative joint disease. (R. 817-18). The x-rays also indicated "no definite effusion," but showed a "high-riding patella bilaterally." (R. 818).

Sykes visited Virginia Institute for Sports Medicine in February 2016, where x-rays showed abnormal positioning of the kneecaps and mild degenerative changes. (R. 842). The PA-C who examined Sykes concluded that he had chronic knee pain.[3]  Id. Exam notes indicate Sykes' pain symptoms were exacerbated by climbing or descending stairs, squatting, and lunging.  Id. However, Sykes' gait and range of motion in both his knees was normal.  (R. 841).  The PA-C planned injections, and referred

---

[3] There is some ambiguity as to whether the PA-C informed Sykes he would need knee surgery.  ALJ concluded that the PA-C did not inform Sykes that he would need knee replacements.  This may be due to lack of clarity in the PA-C's notes, which stated: "[Sykes] has chronic patellofemoral syndrome.  He's been told by the military and will eventually need knee replacements, I suspect this is mostly patellofemoral joint replacements." (R. 842).

Sykes to a Dr. Campbell to discuss surgical intervention over continued conservative treatment. (R. 842).

### 3. Feet and Ankle Treatment

Sykes also complains of foot pain. (R. 22, 34, 39-41, 46, 49, 657). In October 2013 and 2015, he travelled to medical appointments without distress or assistance. (R. 257, 660). In November 2015, however, Sykes told his physician he had pain in the ball of his left foot, as well as in his right heel. (R. 657). His physician prescribed shoe insoles. (R. 659). X-rays from December 2015 then revealed a bunionectomy defect and degenerative joint disease of the left foot. (R. 816-17). Sykes' right foot exhibited a mild bunion, minimal degenerative joint disease, and a probable small spur. Id. On December 25 2015, Sykes fell in the bathroom, injuring his right heel and twisting his left ankle. (R. 758). Medical records from January 2016 indicate Sykes used braces and shoe inserts for chronic pain in his ankles and feet. (R. 758-59). Later that month, his podiatrist recommended braces, orthoses, shoes, and physical therapy to treat Sykes' chronic pain. (R. 745-46).

### 4. Shoulder and Arm Treatment

In February 2015, Sykes visited an orthopedic surgeon for prolonged weakness and numbness in his left shoulder, as well as pain in his right elbow. (R. 405). The surgeon reported that

Sykes had also had three previous surgeries on his right shoulder, and that both shoulders had limited motion. Id. The pain in his left shoulder disrupted his sleep, and Sykes had previously received injections for pain in both shoulders. (R. 406). X-rays of Sykes' elbow showed mild degenerative joint disorder, and an MRI of this shoulder indicated partial sided tears. Id. The surgeon assessed Sykes as having a left shoulder impingement and bursitis. Id. Sykes' right elbow exhibited painful inflammation. Id.

Similarly, in March 2015, an MRI of Sykes' right elbow showed a lesion, as well as mild degenerative changes. (R. 818). The MRI indicated no fracture or solid masses. Id. Sykes began physical therapy for the bursitis in April 2015. (R. 401-02). He reported to the physical therapist that he could independently perform daily living activities with fair tolerance. (R. 402). After reporting a decrease in symptoms, in June 2015, Sykes was discharged from physical therapy with planned independent exercise. (R. 706-07). Shortly thereafter, Sykes refused a cortisone injection in his right elbow, but requested an injection the following month. (R. 684).[4] He reported pain in his right shoulder in July 2015. (R. 684).

---

[4] The ALJ, in his decision, stated Sykes refused a Botox injection, rather than a cortisone injection. There is some lack of clarity in the record as to the injection Sykes actually refused. Medical notes

At a follow-up visit for his left shoulder, Sykes reported
the pain was unchanged, but his treatment had met his pain goal
and he could perform activities of daily living. (R. 678). Sykes
reported in September of 2015 that Percocet made his shoulder
"[feel] much better." (R. 671). He reported a pain level of 4
out of 10 in his right shoulder in January 2016. (R. 764).

5.  Kidney Treatment

In October 2015, Sykes' kidney function was stable. (R.
662). Sykes, however, had been diagnosed with kidney disease.
(R. 705). Medical records from 2014 indicate renal cysts in each
kidney, as well as possible autosomal dominant polycystic kidney
disease ("ADPKD"). (R. 716). On referral from the Department of
Veterans Affairs to the University of Virginia in June 2014,
Sykes presented as asymptomatic, and his cysts were listed as
uncharacteristic of ADPKD.[5] (R. 360). The same examination
indicated gross hematuria with a urinary tract infection treated
with antibiotics. Id.

In June 2015, though, a VA examination indicated Sykes had
Stage III chronic kidney disease ("CKD"), with possible ADPKD.
(R. 705). A nephrology follow-up in December 2015 reiterated

from Sykes' physician in July 2015 state Sykes refused a recommended
injection because the offered injection was Botox. (R. 684). Sykes
states the same in his Motion for Summary Judgment. (ECF No. 15 at
10). An addendum to the physician's notes, however, indicates Sykes
had been offered a cortisone injection. (R. 687).
[5] Earlier VA examinations in 2014, however, indicated possible ADPKD or
Stage II CKD. See (R. 282, 285.)

the same. (R. 781). A summary of active problems in March 2016 listed Sykes' kidney disease as mild Stage II. (R. 866).

### 6. Vertigo Treatment

Sykes also claimed disability for vertigo. (R. 67-68). He requested a prescription for vertigo medication in September 2015, stating that he felt the room to be spinning or bouncing. (R. 673). Sykes informed his physician he had been treated for Vertigo in the past. (R. 671). His physician then prescribed Meclizine. (R. 672). The record does not appear to contain further complaints of vertigo. (R. 1-884).

### 7. Hypertension Treatment

As early as 2014, Sykes was taking Lisinopril for hypertension, and was still taking a smaller dosage in October 2015. (R. 330, 811). In June 2014, the physician who saw Sykes on referral from the VA for renal cysts noted Sykes had hypertension, with a blood pressure of 130/90. (R. 362). Similarly, in June 2014, a VA medical exam indicated a blood pressure of 128/85, and noted that Sykes needed to control his blood pressure. (R. 436). Sykes' blood pressure was stable in November 2014. (R. 524-25).

A nephrology exam in June 2015 assessed that Sykes' kidney disease was possibly related to hypertension. (R. 705). Sykes' primary care physician wrote on October 6, 2015 that Sykes had

suffered a recent drop in blood pressure. (R. 664). His blood pressure on that date was 128/80. Id. The day before, Sykes' blood pressure had fallen to 93/60 and he reported feeling weak, with a major headache and lightheadedness. (R. 668). His blood pressure normalized that same day. (R. 667-68). Records from December 2015 confirm that Sykes had a significant history of hypertension. (R. 516). A summary of Sykes' medical history indicates Sykes exhibited hypertension into 2016. (R. 727, 759). Although the record shows specific instances where Sykes' blood pressure was routinely taken, the record does not show additional complaints of high blood pressure or hypertension. See, e.g., (R. 651).

## B. VA Disability Ratings

In July 2013, the Department of Veterans Affairs ("VA") awarded Sykes a 50% disability rating for obstructive sleep apnea, treated with a CPAP machine. (R. 152). In March 2014, Sykes was seen for a sleep medicine consultation, and the clinic technician noted that Sykes' compliance rate with the CPAP use was 13%. Id. Specifically, Sykes had used the CPAP ninety-nine days out of three-hundred and sixty-five, for an average length of an hour and four minutes. Id. The technician's notes, however, imply that the CPAP's face mask was too large for Sykes' face and required replacement. Id. Sykes was still

using the CPAP machine as of 2015, but complained it was causing him to choke and his throat to dry. The technician advised that he had been using the machines humidifier incorrectly. (R. 454).

In 2013, the VA also awarded Sykes a 30% rating for migraine headaches. (R. 152). The decision was based on "characteristic prostrating attacks occurring on an average once a month of last several months." Id. An unrelated nephrology exam in 2014 notes Sykes had a history of migraines, but stated Sykes reported they occurred with less frequency than they once had. (R. 435). Sykes was also diagnosed with a tension headache in October 2015. (R. 652). Also, when Sykes' blood pressure dropped in October 2015, he complained of a major headache. (R. 668). He was also treated for a tension headache in connection with a respiratory infection the following month. (R. 668). He requested a new prescription for acetaminophen for migraine headaches in January 2016, which his physician prescribed. (R. 754-55). The record does not reflect other complaints of migraines.

C.   **Medical Source Opinions and Administrative Hearing**

Medical source opinions at both the initial and reconsideration level found that Sykes had degenerative conditions, but otherwise demonstrated normal strength and gait.

11

(R. 71, 82). Both reports found that Sykes' kidney function, blood pressure, sleep apnea, and vertigo were all controlled with treatment. (R. 71). The reports also found that the severity of Sykes' symptoms - and their "alleged effect(s) on [his] function - were not wholly consistent with medical and non-medical evidence. For example, some symptoms were disproportionate to medically determinable impairments. Id.

At the hearing before the ALJ, Sykes testified that he stopped working as a military analyst because of pain in his shoulders, back, knees, and ankles, as well as sleep apnea and vertigo.[6] (R. 39). Likewise, Sykes testified he is currently unable to work in light of his vertigo, as well as constant pain, which is only partially alleviated by specific medication that does not exacerbate his kidney condition. (R. 41). Sykes stated he has a Tramadol prescription for his pain. (R. 42). Sykes estimated he could walk for five minutes before the pain forced him to stop, and estimated he could stand still for six to ten minutes if he exerted himself against back, knee, ankle, and foot pain. (R. 47-49). When asked how long he could sit at one time without having to stand, Sykes stated he thought he could sit for twenty to thirty minutes (R. 49).

---

[6] Sykes testified that, except for a period of approximately a week, he regularly used his CPAP machine.

Sykes testified that, in a typical day and depending on how he feels, he may eat breakfast his daughter prepared or fix himself cereal, watch the news, perform small household tasks, or lay back down to sleep. (R. 51). He may walk to the mailbox or correspond with his physician via computer. (R. 52). He stated he does not cook himself dinner, but will occasionally go to church or to the grocery store with his daughter. (R. 53).

Sometime around July 2014, Sykes travelled to Ethiopia. (R. 54-55, 561). In 2016, he informed his doctor he had plans to go Ethiopia again, as well as to Saudi Arabia. (R. 55, 854). When the ALJ asked how Sykes endured a flight to Ethiopia in light of his claimed conditions, Sykes stated he pushed himself, but that the flight was "miserable." (R. 56).

A vocational expert ("VE") also testified at the hearing. (R. 61-65). The ALJ posed hypotheticals to the VE, asking whether someone with Sykes' profile could perform his previous work or, alternatively, any work that existed in the national economy. Id. The VE testified Sykes could perform his past job as a military analyst, because it involved light work and he did not have to climb ladders, ropes, and scaffolds, but may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. 63). The VE also testified Sykes could perform sedentary work. Id. When asked if unscheduled breaks

totaling thirty minutes would eliminate competitive employment for Sykes, the VE testified that it would. (R. 64).

### III. **STANDARD OF REVIEW**

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

14

decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for DIB under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act. See 42 U.S.C. §§ 416(i) and 423.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous

15

work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R.

16

§§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65. F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962). At all steps, the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d 1456.

## A.    The ALJ's Decision

After reaching step four of the above analysis and concluding Sykes could perform past relevant work as a military analyst,[7] the ALJ determined Sykes was not disabled under the Social Security Act.  (R. 25).  Though Sykes' medical records indicate serious medical conditions, the ALJ's decision was supported by substantial evidence.

---

[7] Sykes past position as a military analyst is variably referred to in the record as an "identification clerk." See, e.g., (R. 24-5, 62).

At step one, the ALJ found that Sykes had not engaged in substantial gainful activity since August 1, 2015, the alleged disability onset date. (R. 15). At step two, the ALJ found Sykes suffered from several severe impairments, including: osteoarthritis of the right knee and bilateral chondromalacia patellae; degenerative disc disease of the cervical spine; degenerative changes of the right elbow; small tears supraspinatus and infraspinatus of the left shoulder; obesity; fasciitis; high blood pressure; sleep apnea; vertigo; and chronic kidney disease. (R. 17). Next, under step three, the ALJ found that Sykes did not have an impairment or combination of impairments that met the severity of one if the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1. (R. 18). And at step four, the ALJ concluded Sykes was capable of performing his past relevant work as a military analyst. However, the ALJ did formulate a residual functional capacity ("RFC") that limited Sykes to light work, and required him to avoid climbing ladders, ropes, and scaffolds; allowing occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (R. 20-25).

In challenging the ALJ's holdings, Sykes' pro se pleadings do not exactly align with the specific analysis required in this court. But Sykes has generally outlined evidence which he argues

supports his claim of disability. He argues the ALJ erred in concluding that his conditions are not as severe as claimed and that he is capable of performing past relevant work.[8]

## B. The ALJ Properly Evaluated Evidence Weighing on Sykes' Residual Functional Capacity

Residual functional capacity is a claimant's maximum ability to work despite their impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). If a claimant's impairments do not meet or medically equal a listed impairment at step three of the ALJ's analysis, then the ALJ must determine the claimant's RFC. See 20 C.F.R. § 404.1520(e). The ALJ uses the RFC in order to determine whether a claimant can perform their past relevant work. See 20 C.F.R. § 404.1545(a)(5)(i). If the ALJ determines that a claimant cannot perform past relevant work, the ALJ uses the RFC at step five to determine

---

[8] Because Sykes is a pro se litigant, he is entitled to liberal construction of his pleadings. See Miller v. Barnhart, 64 F. App'x 858, 859 (4th Cir.2003) (unpublished) (per curiam) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). Overall, he takes issue with ALJ's conclusion that his conditions do not preclude an RFC to perform light work. See (ECF No. 15 at 6-7). Specifically, Sykes argues the ALJ erred in determining that his conditions were not as severe as claimed and that, in actuality, he cannot perform even light work. The court, therefore, addresses the argument that the ALJ incorrectly determined Sykes' RFC. (ECF No. 15 at 12.)

19

whether the claimant can adjust to other work that exists in the national economy. See id. at (a)(5)(ii).

The ALJ determines a claimant's RFC at the administrative hearing level. See 20 C.F.R. § 404.1546(C). The ALJ determines the RFC by considering all relevant medical and other evidence in the record, including impairments based on the claimant's credible complaints. See 20 C.F.R. §§ 404.1545, 404.1527(b). Relevant evidence can include "information about the individual's symptoms and any 'medical source statements' - i.e., opinions about what the individual can still do despite his or her impairment(s) - submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184 *1, *2 (S.S.A).

   1.  <u>Substantial Evidence Supports The ALJ's Conclusions Regrading Sykes' Migraines, High Blood Pressure, Vertigo, and Kidney Disease</u>

In his Motion for Summary Judgment, Sykes specifically addresses several of his medical conditions in arguing the ALJ erred in determining that some conditions were not as severe as claimed. See (ECF No. 15). He first argues that the ALJ erred in deciding that his migraine headaches are non-severe and have not occurred with the "frequency, intensity, or duration to significantly limit his functional capacity." (ECF No. 15 at 5); (R. 18, 24).

As implied above, to be "severe," an impairment must "significantly limit[ ] [claimant's] physical or mental ability to do basic work activities . . ." 20 C.F.R. §§ 416.920(c), 404.1520(c). An impairment is not severe if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to do work . . . ." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ determined that Sykes headaches were nonsevere based on: (1) Sykes' report of a headache in October 2016; and (2) his request for a prescription for migraine headaches in January 2016, stating he only had two pills left from November 2013—though he did not complain of migraines at that time. (R. 18). The ALJ concluded, because the record did not reflect significant treatment for headaches and did not result in functional limitations, the condition was non-severe. Id.

The record shows Sykes' suffered from migraines and headaches. See (R. 152, 435, 652, 668, 754-55). Sykes stated in his Motion that he has headaches almost weekly, and that the ALJ overlooked a CT scan, doctor's visits, and medication trials. (ECF No. 15 at 5). The treatment in the record, however, is relatively minimal and does not reflect the

21

frequency or severity Sykes claims. (*See* R. 152, 435, 652, 668, 754-55).

Other than the post-hearing evidence which Sykes submitted with his Motion, no further treatment is apparent. (R. 1-884). No evidence supports Sykes' position that headaches significantly impeded his ability to perform basic work activities during the time period evaluated at the hearing. Along with the medical source opinions concluding the alleged severity of Sykes' symptoms was not consistent with evidence, there is substantial evidence to support the ALJ's conclusion that Sykes' migraines were non-severe.

Sykes also argues that the ALJ erred in his conclusions regarding Sykes' blood pressure, kidney disease, and vertigo. (ECF No. 15 at 6-7, 12). The ALJ determined that all three conditions were severe, (R. 17), but did not meet the severity of a Social Security listing. (R. 19).[9] Sykes appears to take issue, again, with the ALJ's determination the conditions do not preclude the capacity for light work. (ECF No. 15 at 6-7); (R. 21-23). In concluding that the vertigo, high blood pressure, and kidney disease did not preclude light work, the ALJ incorporated

---

[9] Social Security regulations include a list of impairments considered disabling. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. To meet a Listing, a claimant must establish that their impairments satisfy particular criteria or "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; 20 C.F.R. § 404.1520.

provisions into the RFC to accommodate any functional limitations imposed by Sykes' relevant symptoms. (R. 22). But the ALJ ultimately found that the stability of the kidney disease, lack of complaints for vertigo, and lack of recorded migraines did not demonstrate Sykes' inability to perform light work. (R. 22); see also (R. 20-23).

Although Sykes argues that the ALJ erred by failing to mention specific findings in the record,[10] the ALJ considered Sykes' own testimony, Sykes' medical records, and medical source opinions. (R. 20-23). Sykes argues that in July 2014, he had symptoms of kidney failure, which the record confirms. (R. 379). The ALJ correctly wrote, however, that just prior to Sykes' alleged onset date, he was asymptomatic for kidney disease and in October of 2015, his kidney function was stable. (R. 360, 662). While the record reflects various instances of significant kidney impairment, see, e.g., (R. 379, 705, 716), medical source opinions indicate Sykes' kidney function is controlled with medication. (R. 71, 82). Records from March 2016 indicate only mild stage II kidney disease. (R. 866). The

---

[10] For instance, Sykes states that the ALJ unfairly failed to state that in July 2014 Sykes had an estimated glomerular filtration rate of 14.4 ml/min, which indicates Stage V kidney failure. (ECF No. 15 at 7); (R. 379). Sykes neglects to mention, though, that the July 2014 reading was one of several readings taken from 2014-2015, none of which indicated the same level of kidney damage. (R. 376-384).

23

record does not reflect that Sykes suffered any functional limitations as a result of his kidney disease. (R. 1-884).

As for Sykes' vertigo, Sykes testified that his vertigo causes the room to spin and is constant. (R. 43). Without citing to any evidence in the record, Sykes argues in his Motion simply that he deals with vertigo on a constant basis. (ECF No. 15 at 7). Yet, the record only shows one request for vertigo medication in September 2015. (R. 673). Contrary to Sykes' argument, medical source opinions at the initial and reconsideration levels state that Sykes' vertigo is controlled with medication. (R. 71, 82). The ALJ was entitled to rely on this evidence in determining Sykes' RFC.

Sykes' medical history does indicate high blood pressure, which the ALJ evaluated. (R. 19). In doing so, he found that hypertension generally causes its disability through damage to other bodily systems (i.e., kidneys or heart). Id. The ALJ found that Sykes' high blood pressure did not damage any other systems. Id. While a nephrology exam does note that Sykes' hypertension was possibly linked to his kidney disease, (R. 705), no functional limitations are evident in the record. (R. 1-884). Medical notes indicate Sykes needed to control his blood pressure, and that he was taking Lisinopril for hypertension. (R. 330, 436, 811). But outside of specific

instances of care – when his blood pressure dropped in October 2015 (R. 664, 668) – the record does not indicate Sykes blood pressure prevented him from working or travelling.

In light of the above, there is substantial evidence that, like his migraines, Sykes' blood pressure, kidney disease, and vertigo do not limit his functional capacity or prevent him from performing past relevant work. Sykes' physicians placed no functional limitations on Sykes, the record lacks complaints of diminished ability to function in light of the conditions, and the conditions appear stable, mild, or otherwise treated with medication. See, e.g., (R. 330, 360, 662, 673, 811, 866). What is more, the ALJ specifically incorporated accommodations into Sykes' RFC for the conditions, including limiting him to light work. (R. 22).

### 2. Substantial Evidence Supports the ALJ's RFC Determination

In addition to specifically addressing the above conditions in his Motion, Sykes variously and generally addresses other disagreements with the ALJ's decision. Sykes disagrees with the ALJ's determination of his ability to perform work such as climbing ramps. He also objects to the consideration of his daily activities and travel. Finally, he criticized the use of non-examining physicians' opinions, and consideration of the VE's testimony. (ECF No. 15 at 6, 9-11). For the following

reasons, however, the ALJ properly weighed the evidence and substantial evidence supported his decision.

Sykes implies, without citation, that the "third-party's (doctors) opinion[s]" are not entitled to weight because the examiners never met with him. Id. at 10. He appears to argue that it is impossible for any doctor who actually examined him to say if he is capable of performing ordinary tasks such as climbing stairs, and so it is similarly impossible for a non-examining physician to do so. Id. Sykes' implication is incorrect. It is well-established that the ALJ may consider medical source opinions by agency medical consultants. See 20 C.F.R. § 404.1527(e)(2); see also SSR 96-6p. The ALJ gave great weight to the non-examining medical source, which he is permitted to do insofar as they are consistent with the record. Id.

The medical source opinions concluded that Sykes was not disabled, and that Sykes claimed symptoms were not entirely consistent with the record. (R. 71, 82). Other than an unsubstantiated claim that the "third-party" opinions missed key facts, Sykes does not identify any reason the ALJ should not have given the opinions weight. (ECF No. 15 at 10). And while a treating physician's opinion would traditionally receive more weight, see 20 C.F.R. § 404.1527, the record does not contain

one which conflicts with the medical source statements during the relevant time period. Accordingly, the ALJ did not err in analyzing the medical source opinions.

Moreover, consideration of Sykes' daily activities and travel was not error. The ALJ determines RFC by considering all relevant medical and other evidence in the record. See 20 C.F.R. §§ 404.1545, 404.1527(b). Sykes argues that his pain prevents him from occasionally climbing stairs and ramps, balancing, stooping, kneeling, crouching, and crawling. (R. 6). Yet, while the record clearly reflects severe impairments like degenerative disc disease, see, e.g., (R. 241-72), treatment history simultaneously reflects essentially normal gait and lumbar range of motion. (R. 241-72). So too with his osteoarthritis; the record shows degenerative changes in Sykes knees, but as recently as February 2016, the range of motion in Sykes' knees was normal and his gait was non-antalgic. (R. 841). And according to medical records, the degenerative changes in Sykes' back and knees were mild. See, e.g., (R. 334-5, 353, 241-72, 717, 842).

Sykes claims that pain in his back and knees prevents him from performing light work, (ECF No. 15 at 6, 12), and that he is rendered unreliable because of his conditions. (R. 12). But his generally normal history of gait and range of motion

diminishes that argument. Indeed, Sykes claims that any time he goes to sit, he experiences severe pain and that he cannot walk without severe pain. (ECF No. 15 at 6, 12). But not only has Sykes exhibited essentially normal gait and motion, he has routinely travelled to medical appointments without assistance, and he endured a lengthy international flight to Ethiopia for apparently discretionary travel. (R. 54-55, 241-72, 561, 660, 854). As late as 2016, Sykes was planning additional international travel, including a trip to Saudi Arabia and return to Ethiopia. (R. 55).[11] These facts contradict his claim that he cannot sit for more than twenty to thirty minutes because of the pain.

Further, Sykes ostensibly argues that the ALJ erred in not giving more weight to the vocational expert's opinion that thirty minutes of unscheduled breaks throughout the day would eliminate competitive employment for Sykes. (ECF No. 15 at 11); see (R. 64). But his argument is without merit. The ALJ must weigh all of the evidence, and determine what is credible and

---

[11] Sykes testimony in front of the ALJ suggests that he did not travel back to Ethiopia or to Saudi Arabia in 2016, citing advice from a non-treating physician that he should not travel due to his conditions. See (R. 55). However, the advice he related does not appear in Sykes' medical records. And the fact that Sykes voluntarily made plans for two additional international trips as recently as 2016 supports the ALJ's conclusion that his testimony concerning the severity and limiting effects of his symptoms was not entirely credible.

consistent with the objective medical record. <u>Hays</u>, 907 F.2d at 1456. In this case, although Sykes is correct about the VE's conclusion concerning the effect of taking unscheduled breaks, he overlooks that the ALJ did not find Sykes' own testimony about the severity of his symptoms entirely credible. (R. 20-21). That is, the ALJ did not believe that Sykes was truly limited to only sitting for up to thirty minutes at a time, and thus would not need repeated unscheduled breaks. <u>Id.</u> This conclusion was supported by the evidence, including a lack of medical source opinions detailing such a limitation, as well as Sykes' own admissions that he had engaged in international travel. This court does not undertake to re-weigh evidence. <u>Hays</u>, 907 F.2d at 1456.

In sum, the ALJ's determination of Sykes's RFC was not improper. Sykes' conditions are not insignificant, which the ALJ accounted for in concluding he was capable of light work. <u>See</u> <u>generally</u> (R. 63-66). But contrary to his contention that he cannot carry out the activities of daily living, Sykes' treatment history is relatively mild and his conditions are stable with treatment. <u>See</u> <u>generally</u> (R. 330, 360, 662, 671, 673, 811, 866). Despite claiming that severe pain prevents him from performing daily home and work activities such as pushing, he reported he could perform daily activities just before his

alleged onset date, and the degenerative changes he complains of did not prevent him from travelling internationally. (R. 54-55, 561, 678).

Considering all the evidence before the ALJ – namely the medical source opinions and Sykes' mild treatment history – the finding of non-disability was reasonable.[12] See Richardson, 402 U.S. at 401. The undersigned therefore recommends the court find substantial evidence supported the ALJ's decision and deny Sykes' Motion for Summary Judgment.

## C. The ALJ Did Not Err in Considering Obesity

Sykes argues that the ALJ erred in considering his obesity because the ALJ should have been able to see that Sykes was not obese. (ECF No. 15 at 8). Sykes apparently believes the ALJ's finding regarding obesity is a decision which would preclude benefits if it is found that his obesity contributes to his symptoms. This understanding is not correct. Social Security

[12] Although Sykes did not raise a specific objection concerning the ALJ's assignment of less than substantial weight to his VA disability rating, the court notes that the ALJ carefully distinguished the VA findings pursuant to Bird v. Commissioner of Social Security, 699 F.3d 337 (4th Cir. 2012), in a full page of analysis. See (R. 23-24). Specifically, the ALJ found that the ratings did not warrant substantial weight because Sykes' testimony and medical records were inconsistent with the level of disability assigned by the VA. (R. 24). As a result, the ALJ properly assessed Sykes' VA ratings under Bird because he "explicitly detail[ed] the reasons for discrediting the VA rating and the 'record before the ALJ . . . demonstrate[d] that such a deviation [wa]s appropriate." Id. (citing Bird, 699 F.3d at 343).

Ruling 02-1p - "Evaluation of Obesity" - states that obesity is a medically determinable impairment that the ALJ must consider in the sequential analysis. SSR 02-1p, 2002 WL 34686281 at *1-3. The ALJ must assess the effect obesity has on a claimant's capability to perform routine movement and required physical activity at work. Id. at *6.

As was required, the ALJ's analysis was based on evidence from the record, including measurements of Sykes' body mass index (BMI) from August 2015 through February 2016, and actually construed the obesity factor in Sykes' favor. The ALJ found that obesity reasonably contributed to Sykes' symptoms, causing some functional limitations to postural activities. (R. 23). He accommodated these limitations in an appropriately formulated RFC, so his consideration of obesity did not diminish Sykes' claim for benefits. Because the ALJ did not err in considering obesity, the court need not address the argument further.

D.  **The Court's Review Is Limited to the Record[13]**

Sykes submitted 133 pages of additional evidence with his Motion for Summary Judgement, including medical records from his military service and treatment records from after the ALJ's

[13] For the reasons listed in this section, other than what is addressed in the medical history and analysis above, the court also does not address Sykes' unsupported claims in his Motion for Summary Judgment regarding current symptoms and medications, caregiver status from the Department of Veterans Affairs, a grant from the Virginia Housing Development Authority, or his alleged history of physical fitness achievements while in the military. (ECF No. 15 at 2-4).

decision. (ECF No. 15-1). As noted, when reviewing a decision of the Commissioner, the court's purpose is to determine whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). When reviewing an ALJ's decision, therefore, the court is limited to the administrative record. Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972).

That said, the court can "order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g).[14] Evidence is new if it is neither duplicative nor cumulative. Wilkins v. Sec'y of Dept. of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991)(citation omitted). New evidence must also relate to the determination of disability at the time the application was first filed, and cannot concern evidence of a later-acquired disability or subsequent deterioration of the previously non-disabling condition.

---

[14] This is sometimes referred to as "sentence six remand," because it refers to the court's ability to remand the decision as laid out in sentence six of 42 U.S.C § 405(g). See Gadbois v. Colvin, No. 2:15-CV-10, 2015 WL 10323034 *1, *7 (E.D. Va. Dec. 28, 2015).

Campbell v. Astrue, No. 2:11cv563, WL 1213057 *1, *8 (E.D. Va. March 1, 2013). "Material" evidence must present "a reasonable probability that [it] would have changed the outcome." Wilkins, 953 F.2d at 96.

Sykes did not request remand or specifically argue that the 133 pages of evidence were new and material. See (ECF No. 15 at 5, 7, 12-13). Sykes simply argues that the ALJ erred in overlooking the evidence, which, in tandem with the record, proves he is disabled. Id. Yet, the ALJ could not have "overlooked" the military medical records, let alone consider records from after his decision, because they were not in evidence. See (R. 1-884). There is also no indication that Sykes alerted the ALJ to the absence of those records that may have existed at the time.

Although the evidence is properly before the court, it would be unlikely to change the outcome in any event. Some of the evidence is simply irrelevant. For example, records of a colonoscopy from July 2016 and a toe fracture from October 2016. (ECF No. 15 at 48-51, 54-56). Some of the evidence, though, conceivably relates to the period before the ALJ's decision, such as records discussing headaches or elbow pain. (ECF No. 15 at 44-46, 67-72). Other evidence, in the form of a brief

medical opinion, accounts for Sykes' pain and concludes Sykes cannot work any type of job. (ECF No. 15 at 15-16).

But the evidence is neither "new" nor "material." The military medical evidence is not new because it is cumulative. While it discusses treatment prior to Sykes' separation from the military, it merely confirms medical conditions already discussed in detail in the record. See, e.g., Gainforth v. Colvin, No. 2:15-cv-205, WL 3636840 at *11 (E.D. Va. May 9, 2016) (evidence was cumulative because it merely asserted a different opinion on symptoms in the record). For example, Sykes' proffered evidence shows mild irregularities in his right knee, as well as injections for pain from osteoarthritis in his left knee. (ECF No. 15 at 17-21). The administrative record already shows Sykes' knee pain, osteoarthritis, and injections. See, e.g., (R. 717, 842).

The post-hearing records are also not "new" because they almost exclusively relate to later deterioration of previously non-disabling conditions. Campbell, WL 1213057 at *8. In other words, while some of the records briefly summarize Sykes treatment history, see, e.g., (ECF No. 15 at 68-71), they do not address Sykes' conditions or functional limitations before the ALJ's decision. See (ECF No. 15-1). Rather, they address

symptoms such as subsequent injuries or treatment for serious pain. See, e.g., (ECF No. 15 at 48-51, 68-71).

An arguable exception is a note from a treating physician, Dr. Michael Ponder, opining that Sykes is unable to work any job in light of his back and other pain. (ECF No. 15 at 15-16). No similar opinion exists in the record. See (R. 1-884). Dr. Ponder's language, however, is ambiguous, and his opinion appears to relate to Sykes' condition at the time of his appointment in January 2017, not to when Sykes first filed his application. Id. The opinion, therefore, is not new. Moreover, an opinion on disability is not entitled to controlling weight because the issue of disability is reserved to the Commissioner. See 20 C.F.R. § 404.1527(d)(1); see also Sharp v. Colvin, 660 F. App'x 251, 256 (4th Cir. 2016).

The rest of the evidence is immaterial for two reasons: (1) most of the records do not relate to the determination of disability at the time Sykes filed the application; and (2) no significant differences in treatments or diagnoses are reflected in the submitted evidence that are not similarly reflected in the record. Thus, there is no reasonable probability that consideration of the evidence would have changed the outcome of the ALJ's decision. Further, Sykes has not established good cause. While the court recognizes some of the treatment occurred

*after* the ALJ's decision, Sykes has offered no reason as to why he could not incorporate or get his proffered evidence into the record prior to the ALJ's decision. See (ECF No. 15). Therefore, the undersigned recommends the court find that remand in this case is unwarranted.

## V.   RECOMMENDATIONS[15]

For the foregoing reasons, the undersigned recommends that the court DENY Sykes' Motion for Summary Judgment, GRANT the Commissioner's Motion for Summary Judgment, and AFFIRM the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's

---

[15] Because the undersigned recommends that the court deny Sykes' Motion for Summary Judgment, it is unnecessary to address Sykes' additional request for benefits from an onset date of 2013. See (ECF No. 15).

objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Am, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is DIRECTED to mail a copy of this Report and Recommendation to all counsel of record.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

August 25, 2017